IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| ANTHONY S. SAWYER, | : | Case No. 4:11-cv-01471 |
|---|---|---|
| Plaintiff | : | (Judge Brann) |
| v. | : | |
| PURDUE PHARMACEUTICAL CORPORATION, | : | |
| Defendant. | : | |

**MEMORANDUM**

December 27, 2013

For the reasons that follow, defendant Purdue's[1] motion for summary judgment (ECF No. 47) is granted; plaintiff Anthony S. Sawyer's motion to amend (ECF Nos. 60 & 61) is denied.

**I.     General Background**

On August 10, 2011, plaintiff Anthony S. Sawyer (hereinafter, "Sawyer"), then (as now) an inmate of the Federal Correctional Institution at Allenwood and

---

[1] Defendant informs the Court that Mr. Sawyer should have identified it not as Purdue Pharmaceutical Corporation, but as P.F. Laboratories Inc., the latter being an "Independent Associated Company" of Purdue Pharma L.P. (Purdue Ex. B, Jan. 9, 2013, ECF No. 48-3 ¶¶ 1-2). The Court will follow defendant's lead and use "Purdue" to refer to the entity against which Sawyer has stated claims.

1

proceeding pro se and in forma pauperis,[2] filed a complaint against defendant

Purdue, a maker of pharmaceuticals.

---

[2]On March 19, 2012, Sawyer's motion for the appointment of counsel was granted by Magistrate Judge J. Andrew Smyser on the condition that an attorney willing to represent Sawyer could be found. (ECF No. 36). After the administrator of the Federal Bar Association's Pro Bono Program reported to Magistrate Judge Smyser that no attorney had volunteered, Magistrate Judge Smyser vacated the order conditionally granting Sawyer's motion, and entered in its place an order denying Sawyer's request for appointment of counsel. (ECF No. 41).

Unfortunately, the United States Court of Appeals for the Third Circuit's "cautious optimism" with respect to the pairing of volunteer counsel and poor litigants meets with disappointment here, and the best the Court can do is join the Third Circuit in encouraging provision of pro bono legal services to poor litigants with potentially meritorious cases:

> We have no doubt that there are many cases in which district courts seek to appoint counsel but there is simply none willing to accept appointment. It is difficult to fault a district court that denies a request for appointment under such circumstances. We note, however, with cautious optimism, that more lawyers are taking on the responsibility of providing pro bono legal services to indigent litigants. Representation of indigent litigants is not only an important responsibility of members of the bar, but it also provides an excellent opportunity for newer attorneys to gain courtroom experience. In Mallard v. United States District Court, 490 U.S. 296, 310, 109 S.Ct. 1814, 1823, 104 L.Ed.2d 318 (1989), Justice Brennan wrote for the Court: '[I]n a time when the need for legal services among the poor is growing and public funding for such services has not kept pace, lawyers' ethical obligation to volunteer their time and skills pro bono publico is manifest.' We encourage lawyers within this circuit to volunteer for such service, and we urge the district courts in this circuit to seek the cooperation of the bar in this regard.

Tabron v. Grace, 6 F.3d 147, 157 (3d Cir. 1993).

In short, the complaint alleged, first, that Purdue was negligent in producing and marketing the drug OxyContin[3] – which Sawyer began taking in 1999 and continued to take for roughly the next decade – and, second, that Purdue breached the warranty of merchantability in relation to OxyContin. (Sawyer Compl., ECF No. 1 ¶¶ 1-16 (hereinafter, "Sawyer Compl.")). Sawyer alleged that, as a result of Purdue's conduct, he was prescribed OxyContin and consequently "suffered serious and permanent brain damage, mental and physical pain, shock and suffering, and other injuries not completely diagnosed." (Sawyer Compl. ¶ 8).

Magistrate Judge Smyser ordered discovery to be completed by April 6, 2012 (ECF No. 26), a deadline that was subsequently extended to August 6, 2012 (ECF No. 37), and then extended again to November 6, 2012 (ECF No. 46).

On January 9, 2013, Purdue filed a motion for summary judgment. (ECF No. 47). On February 14, 2013, well after the time for Sawyer to file opposing papers

---

[3]The original complaint also set forth allegations with respect to "Oxycodone" and "Roxycodone," but Purdue asserts that Oxycodone is a pharmaceutical ingredient used in many medications manufactured by Purdue and others, not the brand name of a particular product manufactured by Purdue. Roxycodone is the brand name of a particular product, but it is manufactured by another pharmaceutical company, not Purdue. (Purdue Facts, Jan. 9, 2013, ECF No. 47-1 ¶¶ 8-9). Sawyer does not dispute Purdue's assertions in this regard – indeed his proposed amended complaint drops any allegations related to Oxycodone or Roxycodone – so the Court will focus only on his claims with respect to OxyContin.

in accordance with this Court's Local Rules had elapsed, Magistrate Judge William I. Arbuckle, III issued an order to show cause, which explained that, if Sawyer did not file papers opposing Purdue's motion by March 15, 2013, Purdue's motion would be deemed unopposed. (ECF No. 52). On March 4, 2013, upon Sawyer's motion, Magistrate Judge Arbuckle granted Sawyer an extension, requiring his opposing papers to be filed not later than April 9, 2013. (ECF No. 54). Magistrate Judge Arbuckle granted a further extension on April 9, 2013, making Sawyer's papers due April 19, 2013. (ECF No. 56).

On April 30, 2013, counsel for Purdue notified the Court that Sawyer had, up to that time, still not filed papers opposing its motion for summary judgment; Purdue sought to have all of its factual averments deemed admitted in accordance with Local Rules 7.6 & 56.1 (party failing to timely oppose motion "shall be deemed not to oppose such motion"). (ECF No. 58).

Sawyer finally filed a brief in opposition to Purdue's motion for summary judgment on May 6, 2013 (ECF No. 59) in conjunction with a motion requesting leave to amend his complaint in order to allege that he had come to "suffer[] from opioid dependency, mania and related injuries" as a result of Purdue's negligence and breach of warranties, not "brain damage," as originally alleged. (ECF Nos. 60-61). Apparently assuming his motion to amend would be granted, Sawyer devoted

his papers opposing summary judgment to establishing that his refashioned claims alleging "the injury of drug addiction" should survive, not his claims alleging "brain damage." (Sawyer Opp'n Br., May 6, 2013, ECF No. 59 at 3 (hereinafter, "Sawyer Opp'n Br."))

Purdue submitted a reply to Sawyer's brief in opposition on May 20, 2013 (ECF No. 62) and opposed his motion to amend his complaint on May 24, 2013 (ECF No. 63).

In response to the Court's June 4, 2013 order to file a motion pursuant to Fed. R. Civ. P. 6(b)(1)(B) for retroactive extension of the time for filing papers in opposition to summary judgment, Sawyer wrote that his pro se status coupled with being "completely buried . . . in mountains of paper [discovery] . . . [and] struggl[ing] . . . to read and comprehend [a] voluminous record, and to make sense of it . . . [in order] to respond to the various motions and pleadings that the Court requires" constituted "excusable neglect" warranting an extension under the Federal Rules. (ECF No. 65).

## II. Preliminary Matters

With respect to Sawyer's motion pursuant to Fed. R. Civ. P. 6(b)(1)(B), because the Court prefers to decide cases on the merits, and because the Court agrees with Sawyer that his neglect in filing his papers out of time is excusable –

especially when the Court takes account of Sawyer's memory problems (resulting from Traumatic Brain Injury) and limited access to the prison law library (see ECF No. 56) – the Court will grant Sawyer's motion for a retroactive extension and deem his opposing papers timely filed.

Of course, Sawyer sought leave to amend his claims on the same date that he submitted his papers opposing summary judgment, which complicates matters slightly. By not incorporating his original complaint by reference, Sawyer intends his amended complaint to supercede the original. 3 Moore's Federal Practice § 15.17[3] (Matthew Bender 3d ed.) ("An amended pleading that is complete in itself and does not reference or adopt any portion of the prior pleading supersedes the prior pleading."). Indeed, as noted supra, Sawyer's papers in opposition to summary judgment argue for the survival of his proposed claims, not his original claims.

Under these circumstances, the Court will analyze whether Sawyer's proposed claims are futile because they fail to cure the deficiencies that Purdue's summary judgment motion has revealed in Sawyer's original claims. If no reasonable jury could render a verdict for Sawyer based on the evidence he would adduce in support of his refashioned claims, then his amendment is futile. See

Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001).[4]

Ultimately, the Court concludes that Sawyer's claims – whether in their original or amended form – cannot withstand Purdue's motion for summary judgment.

## III. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and making all reasonable inferences in the nonmovant's favor, "could return a verdict for the nonmoving party." Id.

---

[4]"It is true that when a cross-motion for leave to file an amended complaint is made in response to a motion to dismiss under Fed. R. Civ. P. 12(b)(6), leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim . . .. However, the rule is different where . . . the cross-motion is made in response to a Fed. R. Civ. P. 56 motion for summary judgment, and the parties have fully briefed the issue whether the proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions. In the latter situation, even if the amended complaint would state a valid claim on its face, the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law." Id.

For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Thus, where the moving party's motion is properly supported and his evidence, if not controverted, would entitle him to judgment as a matter of law, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. In the face of the moving party's evidence, the nonmoving party's mere allegations, general denials or vague statements will not create a genuine factual dispute. See Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1302 (3d Cir. 1993). Only citation to specific facts is sufficient. Anderson, 477 U.S. at 250.

Where the nonmoving party has had adequate time for discovery and will

bear the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and summary judgment is warranted. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

IV. **Facts**

The following recitation is based on Purdue's statement of facts. Where Sawyer is able to support (in accordance with Fed. R. Civ. P. 56(c)) an alternative version of the facts more favorable to his cause, the Court assumes the truth of his assertions and draws all reasonable inferences in his favor.

OxyContin is an opioid pain medication. (Purdue Facts, Jan. 9, 2013, ECF No. 47-1 ¶ 3 (hereinafter, "Purdue Facts")). Purdue received approval from the United States Food and Drug Administration (hereinafter, "FDA") to market OxyContin for the treatment of moderate to severe pain in 1995. (Purdue Facts ¶ 3).

Unfortunately, helpful as it may be in the treatment of pain – and Sawyer readily admits that OxyContin is, in his experience, an effective pain reliever (Id. ¶ 30) – OxyContin carries a high risk of dependence and abuse. Indeed, OxyContin is classified as a "Schedule II" controlled substance under the federal Controlled Substances Act, meaning that, although OxyContin has "a currently accepted

medical use in treatment in the United States or a currently accepted medical use with severe restrictions," it also "has a high potential for abuse" and "may lead to severe psychological or physical dependence." (Id. ¶ 5; 21 U.S.C. § 812(b)(2)).

After Sawyer, residing in New Hampshire at the time (and at all relevant times), fell onto a concrete slab from a height of forty feet in 1999, his doctors prescribed OxyContin to relieve his pain. (Purdue Facts ¶¶ 10-11). From 1999 until he was arrested for various crimes in 2008, he took OxyContin continuously (as well as various other drugs, with varying rates of regularity). (Id. ¶ 12). At some point during this time – Sawyer represents that he was "addicted probably within months of starting" on OxyContin – the drug's high potential for abuse and dependence was fully realized in Sawyer. (Id. ¶ 13; Sawyer Dep., ECF No. 48-2 at 114 (hereinafter, "Sawyer Dep.")).

Sawyer blames Purdue for his descent into the maelstrom. He asserts that Purdue engaged in a campaign to deceive doctors with respect to the risk of abuse and dependence associated with OxyContin. (Sawyer Opp'n Br. at 2-3). According to Sawyer, his own addiction is "easily traced back to [Purdue's] fraudulent, misleading and [sic] misrepresenting claims[, in the absence of] which[] no professional doctor would have prescribed Oxy[C]ontin." (Sawyer Opp'n Br. at 3).

In support of these assertions, Sawyer cites to Purdue's 2007 plea of guilty

to the criminal charge of "misbranding OxyContin . . . with the intent to defraud or mislead, a felony under the federal Food, Drug, and Cosmetic Act." United States v. Purdue Frederick Co., Inc., 495 F. Supp. 2d 569 (W.D. Va. 2007). The information to which Purdue pleaded guilty in 2007 alleged that, between 1995 and 2001, "certain [Purdue] supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." Id. at 571 (quoting information). The information specifically alleged that Purdue's illicit promotional campaign involved deceiving health care providers. Id.

Purdue's plea of guilty only goes so far, however, since "its preclusive effect extends to all issues that are necessarily admitted in the plea," but no further. Anderson v. Comm'r, 698 F.3d 160, 164 (3d Cir. 2012). Sawyer attempts to bridge the gap between Purdue's guilty plea and his injury with his own testimony to the effect that the doctor he saw after his 1999 accident, Dr. Fieseher, prescribed him OxyContin on the stated ground that the manufacturer claimed it was not addictive. (Sawyer Dep. at 69-71, 102). Unfortunately for Sawyer, the bridge crumbles because his testimony cannot establish the truth of Dr. Fieseher's statement, see 5 Weinstein's Federal Evidence § 803.06[8] (Matthew Bender 2d ed.) ("[Fed. R.

11

Evid.] 803(4) does not provide a hearsay exception for statements made by the doctor or other person providing the medical attention to the patient"), and Sawyer presents no other evidence linking representations made by Purdue to his plight. (Sawyer Dep. at 84, 396, 400-401).

Because Purdue defends against Sawyer's negligence claim on the ground that it is barred by Pennsylvania's two-year statute of limitations on actions in tort, the Court notes here that Sawyer has conceded he knew he had a problem with OxyContin by the end of 2008. (Sawyer Dep. 121, 123, 387).

Likewise, because Purdue defends against Sawyer's breach of warranty claim on the ground that Sawyer did not notify Purdue of its breach within a reasonable time, the Court notes here that Sawyer has conceded that he has "never spoken to anybody from Purdue." (Sawyer Dep. at 82, 364).

## V. Discussion

The Court hears this case as a result of its diversity jurisdiction. Purdue asserts, and Sawyer does not contest, that, where conflicts of law arise, New Hampshire law should apply. (Purdue Supp. Br., Jan. 9, 2013, ECF No. 48 at 13 n.4 (hereinafter, "Purdue Supp. Br.")). Even though Sawyer asserts Pennsylvania citizenship for himself and New Jersey citizenship for Purdue, the Court agrees that, applying the forum state's (i.e., Pennsylvania's) choice of law rules, New

Hampshire law applies in the case of a conflict. See Donovan v. Indant Lab., 625 F. Supp. 2d 256, 264-65 (E.D. Pa. 2009) (forum state's choice of law rules apply); Blain v. Smithkline Beecham Corp., 240 F.R.D. 179, 193 (E.D. Pa. 2007) ("Most if not all contacts with the [plaintiffs], such as marketing, prescribing and taking the drug, were in the home states. Thus, the state having the most significant contacts and relationship to the liability issue is each [plaintiffs's] home state.").

On the other hand, Pennsylvania's statute of limitations periods apply. 42 Pa. Cons. Stat. § 5521(b) ("The period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim.").

Purdue asserts three reasons for the futility of Sawyer's amended complaint: Sawyer's negligence action is barred by the statute of limitations; his breach of warranty claim is barred by his failure to timely notify Purdue of its breach; and both of his claims fail because he has not amassed sufficient evidence in support of them. (Purdue Opp'n to Amendment, May 24, 2013, ECF No. 63 at 2-3). The Court considers these arguments in turn.

    a.    **Purdue's Statute of Limitations Defense**

Sawyer's negligence claim – filed August 10, 2011 – is barred by the statute

of limitations.

Pennsylvania puts a two-year statute of limitations on actions in tort, 42 Pa. Cons. Stat. § 5524, and the clock generally begins ticking when the last event necessary to complete the tort occurs, usually the moment when the plaintiff was injured by the defendant. See Yurcic v. Purdue Pharma, L.P., 343 F. Supp. 2d 386, 392 (M.D. Pa. 2004) (Kane, J.). The general rule is modified, however, by Pennnsylvania's "discovery rule," which "delays the running of the statute until the plaintiff knew, or through the exercise of reasonable diligence should have known, of [his] injury and its cause." Urland v. Merrell-Dow Pharm., Inc., 822 F.2d 1268, 1271 (3d Cir. 1987).

Sawyer's excuse for not filing earlier is that as long as he took OxyContin from 1999 through 2008, the medication turned him into a zombie unconsciously lusting to satiate his addiction, but blinded to the very fact that he was addicted. Even taking Sawyer's OxyContin-caused fugue-state as a given, however, by Sawyer's own admission, he knew he had a problem with OxyContin by the end of 2008. Asked at his June 26, 2012 deposition, "So you believe by July of 2008, after you went through those withdrawal symptoms, at that point you knew that you had a problem with OxyContin?," Sawyer answered, "That's when I – that's when it really dawned on me the full force of it, yes." (Sawyer Dep. at 121). Sawyer

backed away from July 2008, but when asked, "When do you think you knew you had a problem with OxyContin?," Sawyer answered, "It was – it was a few months of – of reflecting on the events that brought me to prison [in June 2008]." (Id. at 123). Asked, "Fair to say sometime in 2008 you recognized you had a problem with OxyContin?," Sawyer affirmed, "I think that's a fair statement." (Id.).

Armed with the knowledge of his addiction to OxyContin by at least the end of 2008, Sawyer was in a position to begin pursuit of his claim and commence his negligence action against Purdue within two years (the end of 2010). See Urland, 822 F.2d at 1275 (quoting Berardi v. Johns-Manville Corp., 334 Pa. Super. 36, 44, 482 A.2d 1067, 1071 (1984) (emphasis in original) ("[O]nce [a plaintiff] possesses the salient facts concerning the occurrence of his injury and who or what caused it, he has the ability to investigate and pursue his claim."). (See also Sawyer Dep. at 387 (Sawyer: "I've known since the very beginning, since 2008, since my mind cleared up from the OxyContin, that it was the OxyContin that put me in this position. . . ." Q: "So why didn't you file your complaint until August of 2011, if you knew about your claims against Purdue in 2008?" Sawyer: "I've been trying to do research, and I've been trying to put stuff together. Unfortunately, they were – they were – I couldn't get ahold of any research material.")). Because he commenced his suit on August 10, 2011, more than two years after the last day of

2008, Sawyer's suit is now barred by the statute of limitations.

### b. Purdue's Failure to Give Notice Defense

Sawyer's breach of warranty claim is barred by his failure to timely notify Purdue of its breach. Under New Hampshire's commercial code, a "buyer" who accepts tender of goods (i.e., Sawyer), "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." N.H. Rev. Stat. 382-A:2-607(3)(a).

Sawyer concedes that he did not notify Purdue of its breach prior to his lawsuit (Sawyer Dep. at 82, 364) and does not set forth any reason why the notification requirement should not apply to him. "[A]bsent even an allegation of compliance with the Code's warranty notice provisions, Plaintiff's claim – on that premise – must fail."[5] Town of Hookset Sch. Dist. v. W.R. Grace & Co., 617 F. Supp. 126, 132 (D.N.H. 1984) (applying New Hampshire law). See also Franz v. Purdue Pharma Co., 2006 WL 455998, at *3 (D.N.H. Feb. 22, 2006) (granting Purdue summary judgment when plaintiff who claimed breach of warranty in relation to OxyContin did not allege that she gave notice of her claim prior to filing her lawsuit; applying New Hampshire law).

---

[5]Sawyer's complaint and amended complaint state that he notified Purdue of its breach within a reasonable time, but he cannot rest on his pleadings at this stage.

### c. Purdue's Lack of Evidence Defense

Sawyer's claims cannot survive Purdue's summary judgment motion for another reason: his failure to present evidence establishing that his injuries were caused by Purdue's tortious conduct.

Sawyer claims that Purdue was negligent in the manufacture, design, and distribution of OxyContin, but there is no competent evidence in the record to support this contention. Only a qualified expert could provide the jury an informed basis upon which to conclude that Purdue did not exercise reasonable care in the manufacture and design of OxyContin. See Lemay v. Burnett, 139 N.H. 633, 660 A.2d 1116, 1117 (internal quotation marks omitted) ("Expert testimony is required whenever the matter to be determined is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman."). Likewise, the jury could reasonably conclude that Purdue provided inadequate warnings only with the help of expert opinion on the risks of dependence and abuse associated with OxyContin and the proper level of warning detail needed by doctors and patients. Sawyer's evidence would not permit a jury to do more than speculate on Purdue's negligence; a fortiori, his evidence fails to support the inference that Purdue's negligence caused his injury. Accordingly, Sawyer's negligence claim must be dismissed.

Respecting Sawyer's claim that Purdue breached warranties, the Court again find his evidence lacking. Sawyer admits that OxyContin was an effective pain reliever and otherwise fails – because he presents no expert testimony on OxyContin's defects – to establish that the risks associated with OxyContin made the drug unfit for its ordinary purposes. Accordingly, any claim that Purdue breached the implied warranty of merchantability must fail. Likewise, any claim that Purdue breached express warranties made to Sawyer fails, since Sawyer admits that Purdue gave him no warranties directly (Sawyer Dep. at 84, 396, 400-401) and his testimony with respect to warranties allegedly made to his physician is hearsay. Accordingly, no jury could reasonably find that Sawyer has prevailed on his breach of warranty claims and these claims must be dismissed.

## V.     Conclusion

For the foregoing reasons, defendant Purdue's motion for summary judgment (ECF No. 47) is granted; plaintiff Anthony S. Sawyer's motion to amend (ECF Nos. 60 & 61) is denied.

BY THE COURT:

s/ Matthew W. Brann  
Matthew W. Brann  
United States District Judge